NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| Larry Marshak, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.: 95-3794 (DRD) |
| v. | : | |
| | : | **OPINION** |
| Faye Treadwell, Treadwell's Drifters, Inc., | : | |
| and The Drifters, Inc., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

Appearances by:

Jeffrey Schreiber, Esq.
Meister, Seelig & Fein, LLP
2G Auer Court
Williamsburg Commons
East Brunswick, NJ 08816
 Attorney for Motion Respondents, Larry Marshak, Jody Marshak, Paula Marshak, Andrea
Marshak, DCPM, Inc., Cal-Cap Ltd., Barry Singer, Singer Management Consultants, Inc., and
Charles Mehlich.

William L. Charron, Esq.
Mona Simonian, Esq.
Pryor Cashman LLP
410 Park Avenue
New York, NY 10022
 *Pro Hac Vice* Attorneys for Motion Respondents, Larry Marshak, Jody Marshak, Paula
Marshak, Andrea Marshak, DCPM, Inc., Cal-Cap Ltd., Barry Singer, Singer Management
Consultants, Inc., and Charles Mehlich.

Lowell B. Davis, Esq.
One Old Country Road
Carle Place, NY 11514
 *Pro Se* Motion Respondent

Cindy Salvo, Esq.
The Salvo Law Firm
101 Eisenhower Parkway
Suite 300
Roseland, NJ 07068
      Attorney for Petitioners Faye Treadwell, Treadwell's Drifters, Inc. and The Drifters, Inc.


**DEBEVOISE, United States Senior District Judge**

      Petitioners, Faye Treadwell, Treadwell's Drifters, Inc., and The Drifters, Inc. (collectively referred to as "Treadwell"), move to have Motion Respondent, Larry Marshak ("Marshak"), held in contempt for violating the order of Judge Nicholas H. Politan, dated August 16, 1999, which permanently enjoined Marshak's use of the name, "The Drifters," or any other name that would be confusingly similar to "The Drifters," in the "occurrence, sale, promotion, or advertising of live or recorded musical performances."  Judge Politan's order, upon appeal by Marshak, was affirmed by Court of Appeals for the Third Circuit on February 9, 2001.

      Treadwell also moves to have Motion Respondents, Jody Marshak, Paula Marshak, Andrea Marshak, DCPM, Inc., Cal-Cap Ltd., Barry Singer, Singer Management Consultants, Inc., Charles Mehlich, and Lowell B. Davis, Esq. (individually referred to by name and collectively referred to as "Motion Respondents"), held in contempt for aiding and abetting Marshak in the violation of the injunction.

      In response, Marshak has cross-moved to vacate, or modify, the injunction issued by Judge Politan.  Marshak contends that the injunction no longer is valid because, in 2004, the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office ("TTBA") refused Treadwell's application for registration finding that, based upon the record submitted, the rights of Willie B.

Pinkney, a singer in The Drifters during the 1950s, were superior to Treadwell's.

For the reasons cited below, Marshak's motion to vacate, or modify, the August 16, 1999 Order of the Court will be denied.  Treadwell's motion for contempt and sanctions against the Larry Marshak, Andrea Marshak, Paula Marshak, Charles Mehlich, Lowell B. Davis, DCPM, Inc., Cal-Cap Ltd., Barry Singer, and Singer Management Consultants, Inc. will be granted, but Treadwell's motion for contempt and sanctions against Jordan Marshak will be denied.

**The Relationships between and among the Motion Respondents**

Because many of the Respondents share the same last name, and because the relationships here are critical to the Court's analysis and determination, it is helpful to identify them and their roles in the present action.

**Larry Marshak ("Marshak")** is a promoter of musical groups who was found by the District Court to have infringed upon Treadwell's common law rights to the use of the name "The Drifters," and he and his company RCI Management, Inc. were permanently enjoined from use of the name.  At the time of the hearing, he was an employee of DCPM, Inc. and DCPM Operations, Inc. working under the terms of an employment contract.

**Andrea Marshak ("Andrea")** is Marshak's wife.  She formed DCPM, Inc. after the dissolution of Marshak's company, RCI, where she was employed.  Initially the sole owner of DCPM, Inc., she later brought in as co-owners Paula Marshak, Charles Mehlich, Dave Revels, and Dave Backer.  She is also part owner and representative of DCPM Operations and Cap-Cap, Ltd.

**Jordan Marshak ("Jody")** is Marshak's brother and Paula Marshak's husband.  He allegedly has been disabled from working, and has not worked, for the last ten years.

**Paula Marshak ("Paula")** is Jody's wife and Marshak's sister-in-law.  Formerly employed by Larry Marshak's company, RCI, and Andrea Marshak's company, DCPM, Inc., at the time of the hearing she was co-owner and representative of DCPM, Inc., DCPM Operations, and Cal-Cap, Ltd.

**DCPM, Inc.** is the management agency, located in the basement of Marshak's home, that owns the rights to book The Platters, The Marvelettes, and The Cornell Gunter Coasters.  Although originally owned solely by Andrea Marshak, she eventually brought in Paula Marshak, Charles Mehlich, Dave Revels, and Dave Backer as co-owners.  DCPM, Inc. employed Larry Marshak,

and Lowell Davis served as the company attorney.

**DCPM Operations** is also a management agency, co-owned by Andrea Marshak, Paula Marshak, Charles Mehlich, Dave Revels, and Dave Backer, located in the basement of Marshak's home. Created as the successor company to DCPM, Inc., it books The Platters, The Marvelettes, and The Cornell Gunter Coasters.  At the time of the hearing, DCPM Operations employed Larry Marshak, and Lowell Davis serves as the company attorney.  DCPM, Inc. and DCPM Operations, as its successor, are referred to collectively as "DCPM."

**Cal-Cap Ltd. ("Cal-Cap")** is a licensing company,  co-owned by  Andrea Marshak, Paula Marshak, Charles Mehlich, Dave Revels, and Dave Backer, located in the home of Charles Mehlich, that was formed simultaneously with, and works with, DCPM.  Cal-Cap acquired the right to book The Platters and, later, with Barry Singer, acquired a 50/50 right to book The Legendary Lead Singers of the Temptations.  Lowell Davis serves as the company attorney.

**Barry Singer ("Singer")** is a longtime business associate of Larry Marshak and co-owns, with Charles Mehlich, Singer Management Consultants, Inc., which acquired a 50/50 right with Cal-Cap to book The Legendary Lead Singers of the Temptations.

**Singer Management Consultants, Inc. ("Singer Management")**, owned by Barry Singer and Charles Mehlich, manages singing groups, including The Elsbeary Hobbs Drifters.  Lowell Davis serves as the company attorney.

**Charles Mehlich ("Mehlich")** is a personal friend and business associate of Larry Marshak, serving as the accountant for Marshak's company, RCI.  He is co-owner of DCPM, Inc., DCPM Operations, Cal-Cap, and Singer Management.

**Lowell B. Davis ("Davis")** is, among other things, Larry Marshak's attorney and business associate.  He has represented Marshak in issues related to The Drifters, such as the enforcement of trademark rights against hotels and nightclubs who billed other groups as The Drifters, and he has represented Singer in various business contract issues.  Davis also represented Odessa Hobbs in a royalty suit against Treadwell and Atlantic Records and served as the attorney of record in the incorporation of The Elsbeary Hobbs Drifters in 2003.  As noted above, he serves as the attorney for DCPM, Inc., DCPM Operations, Cap-Cap, and Singer Management.

## BACKGROUND

The background to this motion for contempt by Treadwell is set-forth in two well-reasoned Opinions, that of Judge Politan in <u>Larry Marshak v. Faye Treadwell, et al.</u>, 58 F. Supp. 2d 551 (D.N.J. 1999), wherein Marshak sought to enjoin Treadwell's use of the name "The

Drifters," and that of Judge Alito, in <u>Larry Marshak v. Faye Treadwell, et al.</u>, 240 F.3d 184 (3d

Cir. 1999), Marshak's appeal of the decision of the District Court.  For reasons of judicial

economy, the background need not be repeated here, other than to say that Judge Politan found

Marshak's representations to the Patent and Trademark Office ("PTO"), which ultimately granted

Marshak's registration of the name The Drifters, were overwhelmingly fraudulent.  As a result of

Marshak's fraudulent representations, Judge Politan permanently enjoined Marshak's use of The

Drifters name because it infringed upon Treadwell's common law trademark rights.  Judge Politan

ordered that Marshak provide "a full accounting of all profits derived from his use of The Drifters

name, beginning with Marshak's first act of infringement in 1970," and that

> Marshak and his employees, assigns, licensees, agents, as well as any and all
> entities in which he owns any stake or over which he exerts any influence
> (including but not limited to RCI Management) . . . be and hereby are permanently
> enjoined from using, directly or indirectly, in commerce the name "The Drifters"
> with regard to the occurrence, sale, promotion or advertising of live or recorded
> musical performances.

Marshak appealed.  In February 2001, the Court of Appeals affirmed Judge Politan's

order, holding that the evidence supported the finding that Marshak fraudulently procured

trademark rights, and infringed on Treadwell's common law rights, to the use of The Drifters

name.

On November 27, 2006, Treadwell filed this motion for contempt, alleging that Marshak,

in defiance of the 1999 order of the District Court, as affirmed by the Court of Appeals in 2001,

has continued to infringe upon, and make money from, the use of the The Drifters name by

managing and promoting a musical group with a confusingly similar name, The Elsbeary Hobbs

Drifters.  Treadwell also contends that Marshak has been aided and abetted by the Motion

Respondents and through the corporate identities of DCPM, Inc., DCPM Operations, Cal-Cap, and Singer Management, which, she alleges, were constructed in an elaborate scheme to deceive and evade the Court's order.

Marshak and the Motion Respondents urge the court to deny as a matter of law Treadwell's motion because the evidence of contempt is deficient in that it "is based largely on vague and inadmissible hearsay, incompetent speculation, and intentionally incomplete information and half-truths from interested witnesses." According to Marshak, only Singer Management, Barry Singer, and Charles Mehlich have made actual use of the name The Elsbeary Hobbs Drifters. Marshak contends that use of the name The Elsbeary Hobbs Drifters by Singer Management, Singer, and Mehlich is not proscribed by the injunction because they are not associated with him, they have not acted in concert with him, and he exerts no control over them. Thus, he cannot be implicated in their use of the name The Elsbeary Hobbs Drifters, nor can they be held in contempt of the injunction as his aiders and abettors.

Marshak also cross-moves to vacate, or modify, the injunction, asserting that it is "no longer a fair order" in light of an interceding adjudication by the TTAB in 2004, wherein the rights of Willie B. Pinkney ("Pinkney"), an original member of The Drifters, were found to be senior to those of Treadwell. Following the 2004 TTAB decision, Marshak claims to have acquired from Pinkney a right to use The Drifters name through consent agreements in 1983 and 1996, making Marshak Pinkney's successor to use of the name. Marshak argues that the 2004 TTAB decision in favor of Pinkney collaterally estops Treadwell from re-litigating the matter and "constitutes a material change in circumstances" warranting "vacatur or modification of [Judge Politan's 1999] Injunction."

6

Marshak, contending that Treadwell has made proper service only upon himself and Singer, seeks dismissal of Treadwell's motion for her failure to make proper service upon the Motion Respondents, resulting in violation of their due process rights. Although Marshak acknowledges that he was served at his home/office location with multiple copies of Treadwell's motion papers, he asserts that Treadwell mistakenly assumed that he would accept service on behalf of the Motion Respondents, but he declined to do so.

Motion Respondent Davis, acting *pro se* and filing a separate opposition to Treadwell's motion, consented to the Court's jurisdiction over him personally at the hearing held in April 2007. He argues, however, that he cannot be held in contempt because, although he acts as an agent for the service of process, he is not Marshak's agent or attorney, and Treadwell's claims are barred by the principle of *res judicata* and by the affirmative defenses of laches and acquiescence for her failure to pursue her claims in a timely fashion.

Oral argument was held on April 19 and 20, 2007, at which time the parties had the opportunity to present, and cross-examine, witnesses. Testifying on behalf of Treadwell were David Woods, private investigator; Alonzo Smalls, former singer with The Drifters; and Jon Bauman, an entertainment promoter. Treadwell also called Lowell B. Davis to testify. Testifying on behalf of Marshak and the Motion Respondents were Barry Singer; Andrea Marshak; Paula Marshak; Charles Mehlich; Keith Marshak, son of Larry and Andrea Marshak; Dave Revels; and Larry Marshak.

**Service of Process**

Before moving to the issue of contempt, a determination must first be made concerning the threshold issue of the validity of Treadwell's service of process. As already noted, Davis

consented to the jurisdiction of the Court at the April 2007 hearing, and there is no question about

the sufficiency of service on Larry Marshak and Barry Singer.  It is also clear that sufficient

service was made on the other Motion Respondents to permit them to respond to Treadwell's

claims.

Pursuant to Fed. R. Civ. P. 12(b)(5), a complaint may be dismissed for "insufficiency of

service of process," where the petitioner cannot establish that proper service was made.  <u>Grand</u>

<u>Entertainment Group, Ltd. v. Star Media Sales, Inc.</u>, 988 (F.2d 476) 488 (3d Cir. 1993).

Although Fed. R. Civ. P. 4 governs service on the initial complaint and summons, Fed. R.

Civ. P. 5 permits service of papers other than those associated with the original complaint to be

made by:

(i) handing it to the person;

(ii) leaving it at the person's office with a clerk or other person in charge, or if no one is in
charge, leaving it in a conspicuous place in the office; or

(iii) if the person has no office or the office is closed, leaving it at the person's dwelling
house or usual place of abode with someone of suitable age and discretion residing there.

<u>See</u> Fed. R. Civ. P. 5(b)(2)(A).

Under the circumstances, Rule 5 controls because this is a motion for contempt for

violation of a permanent injunction of this Court and, as such, it is not a new complaint.

Although the primary parties to the original complaint were Marshak as plaintiff and Treadwell as

defendant, the injunction applied equally to Marshak and "his employees, assigns, licensees,

agents, as well as any and all entities in which he owns any stake or over which he exerts any

influence."

Even if Rule 4 controls, however, it "is a flexible rule that should be liberally construed so

long as a party received sufficient notice of the complaint." <u>Direct Mail Specialists, Inc. v. Eclat</u>
<u>Computerized Technologies, Inc.</u>, 840 F.2d 685, 688 (9th Cir. 1988) (citation omitted). "[I]t must
be borne in mind that compliance with the rules governing service of process is to be construed in
a manner reasonably calculated to effectuate their primary purpose: to give the defendant adequate
notice that an action is pending." <u>Top Form Mills, Inc. v. Sociedad Nationale Industria</u>
<u>Applicazioni Viscosa</u>, 428 F. Supp. 1237, 1251 (S.D.N.Y. 1977). Service on a corporation and its
officers is sufficient when it is made "upon an individual who stands in such a position as to
render it fair, reasonable and just to imply the authority on his part to receive service." <u>Id.</u> at 1251
(citations omitted). Courts have generally found that service is sufficient even when made upon a
secretary or receptionist. <u>See</u>, *e.g.*, <u>Direct Mail</u>, 840 F.2d at 688-9.

Marshak was served personally at his office address, which is also his home address, on
November 27, 2006, and, at that time, he also received copies intended for other Motion
Respondents, Andrea, Paula, Jody, Mehlich, and the corporate entities of Cal-Cap and DCPM,
although he later return all but one copy, stating that he could not accept service on behalf of
anyone but himself. Service of process is intended to give the respondents adequate notice that a
motion is pending. That has been accomplished here as evidence by the fact that, with the
exception of Davis who is *pro se*, the Motion Respondents have retained counsel to represent their
interests and have responded by filing opposition to Treadwell's motion. Clearly, information
conveyed in Treadwell's moving papers reached the right people. The Motion Respondents have
not been prejudiced by Treadwell's method of service, and they have been provided with ample
opportunity to mount a defense to her charge. To quash service and require re-service under such
circumstances would be a waste of time and money, and the rules do not require such a result.

See, *e.g.* Wilen I.Y.M., L.C. v. Colter & Peterson, Inc., 1998 WL 1093900 *1, *3 (D.N.J. Sept. 23, 1998).

The current service has accomplished what it is intended to do.  It will not be quashed, and no re-service will be ordered.

**Treadwell's Action Is Not Barred by *Res Judicata*, Laches and Acquiescence**

Davis contends that Treadwell's action is precluded by prior litigations.  This very issue, however, was addressed in Judge Politan's opinion and is no more valid now than it was then.

> The Drifters, Inc. v. Thomas . . . was dismissed because of Treadwell's failure to provide adequate discovery. . . .  No issue was actually litigated in that case and there was no judgment on the merits. . . .  Treadwell was not a party-in-interest in any of Marshak's other lawsuits and she is therefore not bound by them. . . .  The Court also rejects Marshak's assertion that Treadwell should be judicially estopped from claiming rights in the name "The Drifters" based upon her . . . settlement of a royalty dispute in Thomas v. The Drifters, Inc. . . .  This Court has examined the transcript of that settlement; it reflects nothing more than Treadwell's agreement to make certain royalty payments to former members of The Drifters.  She did not . . . disavow any rights or claims to the name "The Drifters."  Indeed, the transcript contains no factual findings or representations of any kind.

Marshak v. Treadwell, 240 F.3d 184, 563-564 (D.N.J. 1999).

Laches and acquiescence are equitable defenses.  See 15 U.S.C. § 1115(b)(9).  The party asserting a laches defense must demonstrate that: (1) the other party inexcusably delayed the filing of suit, and (2) such delay resulted in material prejudice to the defendant.  See, *e.g.*, Joint Stock Society v. UDV North America, Inc., 266 F.3d 164 (3d Cir. 2001).  Acquiescence defense requires the same showing as laches but is applicable "when the trademark owner, by affirmative word or deed, conveys its implied consent to another to use its name or mark."  See Analytic Recruiting, Inc. v. Analytic Resources, LLC, 156 F. Supp. 2d 499, 516 (E.D.Pa. 2001) (citation omitted).  Laches only "becomes relevant where the senior user delays in asserting its rights for so

long that the junior user has developed sufficient demand and goodwill through its own efforts that it would be inequitable to enforce the senior's rights."  University of Pittsburgh v. Champion Prods., Inc., 686 F.2d 1040, 1047 (3d Cir.1982).  Laches requires more than lapse of time.  See Sobosle v. U.S. Steel Corp., 359 F.2d 7, 12 (3d Cir.1966).

As the party asserting the defense, Davis bears the burden of showing that the defense should apply, but he has failed to do so.  While the delay in filing may have been inexcusable, Davis has not demonstrated that he, or the other Motion Respondents, has suffered any material prejudice as a result of any delay in filing.  Acquiescence is inapplicable here because Davis has not shown that Treadwell has affirmatively conveyed consent to the Motion Respondents to use the name The Drifters.

**Marshak and the Motion Respondents' *In Limine* Motions Made at the April 2007 Hearing**

During the course of the hearing, Marshak and the Motion Respondents preserved their objections to preclude Treadwell from introducing and relying upon certain evidence.  They seek to exclude the testimony of Jon Bauman as inadmissible, pursuant to FRE 701, claiming he lacks first-hand knowledge of the dealings of Marshak and the Motion Respondents and, pursuant to FRE 403, claiming its probative value is outweighed by the unfair prejudice it would engender.  They seek also to exclude references to "The Elsbeary Hobbs Drifters" to prove contempt contending that Treadwell knowingly and intelligently waived any claims she had to use the name The Drifters when she agreed to a New York court-approved settlement with the Hobbs's estate in 1999.  In addition, Marshak and the Motion Respondents argue that the tape recorded statements of Phil Reynolds made to private investigator, David Woods, are hearsay and not admissible pursuant to the exception under FRE 801(d)(2).  Last, they contend that the Hatry letter

submitted by Treadwell must be excluded as hearsay and is not admissible under any hearsay exception.

## DISCUSSION

**The Standard for Contempt**

Treadwell seeks an order holding Marshak and the Motion Respondents in contempt for violation of the order issued by Judge Politan in 1999, which was affirmed by the Court of Appeals in 2001.  Treadwell's motion for contempt will be granted as to Larry Marshak, Andrea Marshak, Paula Marshak, Charles Mehlich, Lowell B. Davis, DCPM, Inc., Cal-Cap Ltd., Barry Singer, and Singer Management Consultants, Inc. because the elements of contempt have been met but will be denied as to Jordan Marshak because there is no evidence supporting the claim against him.

"Every order granting an injunction . . . is binding . . . upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order . . . ."  Fed. R. Civ. P. 64(d).  A movant for a contempt order must establish that 1) a valid order of the court existed, 2) the alleged contemnor knew of the order, and 3) the order was violated.  See Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995).  The elements of contempt must be shown by clear and convincing evidence.  Quinter v. Volkswagon of Amer., 676 F.2d 969, 974 (3d Cir. 1982).

A party who is alleged to be in contempt may not challenge the substantive merits of the underlying order.  See Halderman v. Pennhurst State School & Hospital, 673 F.2d 628, 637 (3d Cir. 1982).  An order is only invalid for the purposes of a contempt motion if the court lacked subject matter jurisdiction or personal jurisdiction.  United States v. United Mine Workers, 330

U.S. 258, 293 (1947).

**A Valid Court Order Exists**

The basis for Judge Politan's July 30, 1999, judgment N.O.V. was his finding that Treadwell had not abandoned her common law right to use The Drifters mark and that Marshak's trademark registration of the name was invalid because Marshak, aware that his trademark application contained materially false statements, had fraudulently obtained the trademark registration. Judge Politan ordered a permanent injunction against Marshak's use of the name. Marshak appealed and the injunction was stayed pending the determination of his appeal. On February 9, 2001, the Court of Appeals affirmed "the orders of the District Court insofar as they order cancellation of Marshak's federal registration and permanently enjoin Marshak from using The Drifters name in commerce." Marshak took no further appeal and the permanent injunction immediately became effective.

Thus, the first element of contempt, the existence of a valid order, is satisfied.

However, Marshak argues that Judge Politan's order is no longer valid because Treadwell lost her right to use the name The Drifters when, in 2004, the TTAB found that Willie B. Pinkney's rights were superior to Treadwell's. Marshak again claims the legal right to use the name The Drifters in commerce, alleging that he acquired such right from consent judgments he entered into with Pinkney in 1983 and 1996, which gave him the "'unqualified and exclusive right to use . . . the name or mark THE DRIFTERS,' and to enjoy the goodwill of the mark. Thus, he [Marshak] and Pinkney are in privity with respect to Pinkney's rights over Treadwell." (Marshak's Br. in Opp. and Cross-Mot. to Vacate the Injunction ["Marshak Opp. Br."] 6, Jan. 29, 2007).

A party is in contempt if he violates an injunction, even if he sincerely believes the injunction to be invalid.  Walker v. City of Birmingham, 388 U.S. 307 (1987), *rehearing denied*, 389 U.S. 384 (1967).  "Persons who make a private determination of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."  Maness v. Meyers, 419 U.S. 449, 458 (1975) (citation omitted).  "The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.'"  Id. at 459 (citing United Mine Workers, 330 U.S. at 293).

To date, Judge Politan's order has not been reversed and is still in full force and effect. Marshak must obey Judge Politan's order until the time it is reversed and the injunction is lifted. Until that happens, use of the name The Drifters by Marshak, or anyone else found to be enjoined from its use,  will violate the order.  The question of the validity of his current claim, that he obtained the right to the use of the name The Drifters from Willie B. Pinkney, will be addressed in a separate section below.

**The Order Includes Marshak's Employees, Assigns, Licensees, Agents and Other Entities**

Marshak contends that the application of the injunction must be governed by Fed. R. Civ. P. 65(d) rather than the language of the order because the language of the order is overly broad. [Marshak Opp. Br. 16].  Marshak admits that the injunction is binding upon him as a party to the action, but he asserts that the injunction is not binding upon the Motion Respondents because they were neither parties to the original action nor officers, agents, servants, employees or attorneys of Marshak.  Thus, he argues, the Motion Respondents cannot be held liable for "independent" contempt but only for aiding and abetting Marshak.  (Marshak Opp. Br. 17).

14

An injunction issued pursuant to Rule 65 binds "officers, agents, servants, employees, and attorneys, and . . . those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Judge Politan's order binds "Marshak and his employees, assigns, licensees, agents, as well as any and all entities in which he owns any stake or over which he exerts any influence (including but not limited to RCI Management)."

Sometime prior to 1998, Marshak formed a company, RCI, which he owned exclusively until it was "dissolved" in 1998. [Marshak Dec. 2]. The primary focus of the business was organizing, managing, and promoting singing groups and staging concerts and shows primarily of "doo-wop" musical groups, including, but not limited to, those that Marshak claimed to own the trademark and use of name rights to, such as The Drifters, The Cornell Gunter Coasters, The Platters, the Marvelettes, and the 1950s Supergroup. [Id.]. Marshak employed Andrea [Andrea Dec. 2], Paula [Paula Dec. 2], and Mehlich [Andrea Dec. 3][1] to work in various capacities for RCI. At the hearing, Dave Revels testified that he, too, was employed by RCI. [Transcript 173]. Davis, according to his testimony, served as the attorney for RCI representing, among other things, Marshak's interests in trademark infringement cases. [Transcript 30-31].

Thus, under the language of both Rule 65 and Judge Politan's order, not only is Marshak directly enjoined, but also directly enjoined are Andrea, Paula, Mehlich, Revels, and Davis as servants, employees, or agents of Marshak in his business entity of RCI.

---

[1]In spite of Mehlich's testimony at the hearing in which he denied being an employee of RCI, in his Declaration Mehlich stated that "[i]n 1990, [he] started doing Larry's [Marshak's] personal accounting and also the accounting of his singing group promotion company at the time, RCI Management, Inc. ("RCI")," and that "[he] learned a great deal about the music promotion business through [his] work for RCI." [Mehlich Dec. 2]. This is corroborated by Andrea's Declaration in which she states that Mehlich was "RCI's accountant" as well as her and Marshak's accountant. [Andrea Dec. 3].

15

**The Employees of RCI Knew of Judge Politan's Order and the Injunction**

Andrea [Andrea Dec. 3], Paula [Paula Dec. 3], Mehlich [Mehlich Dec. 5], and Revels [Revels Dec. 2-4], each stated in their individual declarations or hearing testimony that they were aware of the injunction and that their actions did not violate its terms.  Davis, too, was aware of the terms of the injunction for it was he who advised Andrea, Paula, Mehlich, and Revels that the acquisition of The Elsbeary Hobbs Drifters would not violate its terms. [See Revels Testimony, Transcript 182 at lines 18-22].   Despite having notice of the terms, however, none of them moved to intervene or otherwise attack the injunction when it issued.  They may not challenge its legality now in this contempt proceeding arising out of the violation of the injunction.  See Walker, 388 U.S. at 319-20.

Thus, the second element of contempt, the requirement of knowledge of the order, is satisfied as to Andrea, Paula, Mehlich, Revels, and Davis.

**The Order Extends to the entities of DCPM, Inc. and Cal-Cap Inc.**

Although directed at Marshak and his company, RCI, the injunction did not necessarily lapse with Marshak's dissolution of RCI as a working business.  As successors in interest to RCI, the injunction extends to DCPM, Inc. and Cal-Cap.

"An injunction may survive the dissolution of the corporation at which it is directed and continue to bind any successor in interest to the original defendant."  Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc., 154 F.3d 1345 (Fed. Cir. 1998) (citing Walling v. James V. Reuter, Inc., 321 U.S. 671, 674 (1944) (an injunction may be enforced "against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons").  The rule is necessary to prevent an "enjoined defendant from "nullify[ing] a

decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." Regal, 324 U.S. at 14.   This is an appropriate issue for a district court to address.  Walling, 321 U.S. at 675.

**The Formation of DCPM, Inc.:**  Ostensibly due to Marshak's ill health, but coincident with the August, 1998, unfavorable verdict returned against him by the jury in Marshak v. Treadwell, Marshak, by his own admission, and by the admissions of Andrea, Paula, and Mehlich, dissolved RCI.  About the time that Marshak dissolved RCI, however, Andrea, Marshak's wife, formed DCPM, Inc. [Andrea's Testimony, Transcript 100 at lines 12-17].  DCPM, Inc. "[engaged] in the same kind of singing group promotion as had RCI" [Mehlich Dec. 2] and "basically picked up where RCI left off." [Paula Dec. 2].  DCPM, Inc. operated out of the Marshak home, using the same telephone and fax numbers as RCI, and managing, promoting, and organizing singing groups, including The Drifters, The Coasters, The Platters and The Marvelettes, and staging concerts and shows of primarily "doo-wop" musical groups.  Marshak, in his declaration, refers to DCPM, Inc. "as a sort of successor to RCI Management. Inc." [Marshak Dec. 2].  In his declaration, Revels referred to RCI as "DCPM's predecessor company." [Revels Dec. 3].

Andrea was the sole shareholder of DCPM, Inc. [Andrea Dec. 2].  She hired Paula as an employee. [Paula Dec. 2].   Andrea also employed Marshak under a contractual arrangement "in exchange for his assignment to [DCPM, Inc.] of the right to book and collect all revenues from groups in which he had trademark and use rights." [Andrea Dec. 2].  According to Marshak, as part of his employment with DCPM, Inc., he "work[s] with concert organizers and the [singing] groups themselves." [Marshak Dec. 3].  Mehlich remained as the business accountant.  Davis served as the attorney for DCPM, Inc.  [Davis Dec. 1, Marshak Dec. 12, ¶ 34].

By June 1999, Andrea brought in Paula, Mehlich, Revels, and David Backer ("Backer") as co-owners of DCPM, Inc. [Andrea Dec. 2].  Mehlich "took over primary management as DCPM, Inc.'s Chief Operating Officer." [Andrea Dec. 3].  Under the new ownership scheme, Marshak remained as an employee. [Marshak Dec. 3].  Davis continued to serve as attorney for service of process [Davis Dec. 1] and gave legal advice to co-owners concerning DCPM's acquisition of The Elsbeary Hobbs Drifters [Transcript 182 at lines 18-22].   The business continued to promote singing groups in the same manner operating out of Marshak's residence and using the same telephone and fax numbers as RCI had used.

Around the time that the new ownership scheme was implemented, Judge Politan entered his Judgment N.O.V. on July 30, 1999 upholding the jury determination that Marshak fraudulently had obtained the rights to use the name The Drifters and finding that Treadwell had not abandoned her rights to the name.  Marshak appealed to the Court of Appeals and obtained a temporary stay of Judge Politan's injunction.

**The Formation of DCPM Operations, Inc.:** After the Court of Appeals affirmed the injunction in February 2001, the co-owners of DCPM, Inc. decided that DCPM, Inc. would no longer work with Drifters groups.  "[T]o signal this change, the owners of DCPM, Inc. decided to form a new company, DCPM Operations, Inc. . . . which acquired certain assets from DCPM, Inc." [Andrea Dec. 3].

**The Formation of Cal-Cap, Ltd.:** At the same time Andrea brought Paula, Mehlich, Revels, and Backer in as co-owners of DCPM, Inc., Andrea, Paula, Mehlich, Revels, and Backer "simultaneously formed Cal-Cap as a licensing company to work with DCPM," [Andrea Dec 3,

Mehlich Dec. 3].  Mehlich served as the Chief Operating Officer [Mehlich Dec. 3].  Davis served

not only as Cal-Cap's attorney for the service of process [Davis Dec. 1] but also representing Cal-

Cap in court actions [see Mehlich Dec. Exh. B].  According to Mehlich, Cal-Cap "acquired the

right to book . . . The Platters [from DCPM] and "in conjunction with Barry Singer on a 50-50 co-

licensor basis, rights to the group The Legendary Lead Singers of the Temptations ('The

Temptations') as well." [Mehlich Dec. 3].  As a matter of record, Cal-Cap's address is Mehlich's

home address.  [Id.].  Mehlich testified, however, that, as a matter of practicality, he uses the

DCPM location, equipment, telephones and faxes for the purpose of conducting Cal-Cap business.

In determining whether a company is a successor in interest, "[i]t is the duty of the court to

examine the substance of the transaction to ascertain its purpose and true intent."  Bowen

Engineering v. Estate of Reeve, 799 F. Supp. 467, 487-8 (D.N.J. 1992) (citation omitted).  To

determine if a successor company is a "mere continuation" the court looks at factors such as:

"continuity of ownership; continuity of management; continuity of personnel; continuity of

physical location, assets and general business operations; and cessation of the prior business

shortly after the new entity is formed.  Id. at 488 (citations omitted).  "Also relevant is the extent

to which the successor intended 'to incorporate [the predecessor] into its system with as much the

same structure and operation as possible.'" Id. (citation omitted).  "Thus the court should

determine whether 'the purchaser holds itself out to the world as the effective continuation of the

seller.'"  Id. (citation omitted).  "However, the proponent of successor liability need not

necessarily establish all of these factors."  Id.

The indisputable evidence that DCPM, Inc. is the "successor to RCI" is Marshak's

admission of exactly that fact.  Looking at the operations of DCPM, Inc. and applying the Bowen

factors, it is clear that DCPM, Inc. is a mere continuation of, and successor in interest to, RCI.  At

the same time Marshak's business, RCI, was dissolved, DCPM, Inc. was formed by Marshak's

wife for the purpose of carrying on RCI's business operations, including the promotion of The

Drifters, The Coasters, The Platters, and The Marvelettes.  Indeed, Marshak assigned his rights to

the singing groups to DCPM, Inc., ostensibly in exchange for his employment with DCPM, Inc.

The new business entity operated out of the same physical location, the basement of Marshak's

residence, using the same equipment, telephone and fax numbers, and employing the same

individuals in essentially the same capacities, albeit in somewhat different capacities.   Although

Marshak no longer headed the organization, he performed many of the same duties in his

employment with DCPM, Inc. that he had performed for RCI.  Despite Marshak's statement that

his work is only with concert organizers and singing groups, his role is far more extensive than

that.  According to the testimony of Andrea,

> part of his employment is to bring to the partners of DCPM even new groups, new
> ventures, and then his experience also helps us to go to him for advice in the
> marketplace, he's been there for 35 years, as well as questions in contracts or deals
> – anything that we're signing or writing, simple everyday stuff, like you know, not
> certainly as a lawyer.  If I'm questioning some sentence or paragraph in a deal or a
> contract, and I just want to be clear in my head what it means.  I would go to him
> for stuff like that.

[Transcript 90 at lines 17-25].

Further, even though Marshak had signed his rights to his singing groups to DCPM, Inc.

exchange for his contract of employment, he continued his appeal of Judge Politan's order to

retain the right to use the name The Drifters.  This is verified by Marshak's declaration in which

he stated that, while he was working for DCPM following Judge Politan's injunction, he

continued to "[have] rights to, and work with, The Drifters."  This is further supported by

Mehlich's declaration, wherein he states that DCPM continued to "[promote] the Drifters as a result of rights that Mr. Marshak thought he had."

DCPM Operations, Inc. is a mere continuation of DCPM, Inc. and thus of RCI. Motion Respondents point to no substantial change in the operations of the two entities, other than the slight change in title. In fact, Andrea and other Motion Respondents in their declarations refer to DCPM, Inc. and DCPM Operations, Inc. collectively as DCPM. Ostensibly they do this "for ease of reference," but in actuality it appears that there is no significant difference in the operations of two companies.

As described by the Motion Respondents, Cal-Cap, too, is a mere continuation of DCPM, Inc. and, thus, is a mere continuation of RCI. Formed at the same time that Andrea brought in Paula, Mehlich, Revels, and Backer, Cal-Cap took over rights to some of DCPM, Inc.'s singing groups and carried out the same business purposes as DCPM and RCI, using the same employees working out of the basement of Marshak's residence, even though a different business location – Mehlich's home address – was the business address of record.

Thus, applying the Bowen factors, the injunction survives the dissolution of Marshak's company, RCI, and enjoins DCPM, Inc., DCPM Operations, Inc., and Cal Cap as successors in interest to Marshak and RCI.

**The Injunction is Enforceable against Singer and Singer Management**

Marshak argues that the injunction is not binding on non-parties and, as a result, Singer and Singer Management were free to acquire from the Hobbs Estate the rights to and use of the name The Elsbeary Hobbs Drifters. Marshak's argument is unpersuasive.

DCPM, Inc., through Mehlich, investigated the possibility of acquiring the rights to The Elsbeary Hobbs Drifters, but decided not to do so to avoid the appearance of impropriety because of Marshak's employment with DCPM, Inc.  [Mehlich Dec. 4].  Instead, in August 2001, Mehlich and Barry Singer ("Singer") formed a new company, Singer Management, for the purpose of buying the licensing rights to use the name and promote The Elsbeary Hobbs Drifters.  [Mehlich Dec. 4].  According to Singer's testimony,  Singer Management succeeded in acquiring the legal rights to The Elsbeary Hobbs Drifters in October 2001 by paying Odessa Hobbs, widow of Elsbeary Hobbs, a licensing fee.[2]  According to Mehlich's declaration, "Singer Management does sometimes book The Elsbeary Hobbs Drifters for certain shows in combination with other 'doo-wop' groups promoted by DCPM," and "there may be referrals of business between DCPM and Singer Management," but there is no sharing of commissions, profits, or incentives.  [Mehlich Dec. 4-5].

Davis is the attorney for service of process for both The Elsbeary Hobbs Drifters and Singer Management.  [Davis Dec. 1].

Singer testified that since 1999 he, too, was aware of the injunction.  [Transcript 45 at lines 24-25].  It was a definite concern to him because it stood in the way of The Platters, The Coasters and The Drifters performing at the Sahara like they did before the injunction and would result in a loss of money for him because, of the three groups, The Drifters were the biggest draw. Singer stated that he did not want to introduce The Coasters and The Platters without The Drifters.

---

[2]Marshak's attorney raised at the hearing the issue of confidentiality concerning the exact amount of money paid by Singer Management to Odessa Hobbs for the licensing of the name The Elsbeary Hobbs Drifters.  At this juncture, it is not necessary to disclose the exact amount.

To him, it was crucial to the success of the show to use The Drifters in combination with The

Coasters and The Platters at the Sahara.  [Transcript 46 at lines 1-19, 64 at lines 20-24, 65 at lines

2-12].  To be able to package The Drifters with The Coasters and The Platters to perform at the

Sahara, Singer and Mehlich formed Singer Management Consultants, Inc. in August 2001 initially

for the purpose of acquiring the rights to The Elsbeary Hobbs Drifters.  [Transcript 47 at lines 23-

25, 48 at line 1-8].

In testimony, Singer acknowledged that Andrea and Paula suggest or recommend to

potential clients that they book The Elsbeary Hobbs Drifters with The Platters and The Coasters

and that he has not told them to stop such referrals.  [Transcript 74-76].

"There is . . . authority that anyone who takes steps deliberately to thwart the enforcement

of a judicial decree can be hauled into court and dealt with summarily even though he is not

named in the decree or acting in concert with someone that is, or violating any source of legal

obligations other than the decree itself."  U.S. v. Board of Educ. of City of Chicago, 11 F.3d 668,

673 (7th 1993) (citing Washington v. Washington State Commercial Passenger Fishing Vessel

Ass'n, 443 U.S. 658, 692 n. 32 (1979); Herrlein v. Kanakis, 526 F.2d 252, 255 (7th Cir. 1975);

United States v. Hall, 472 F.2d 261 (5th Cir.1972)).

An noted, Rule 65(d) provides that an injunction is binding "upon the parties to the action,

their officers, agents, servants, employees, and attorneys, and upon those persons in active concert

or participation with them who receive actual notice. . . ."    "The plain language of the rule

establishes the principle that a court, in the exercise of its equitable powers, may hold in contempt

those who act in concert with named parties to frustrate an injunctive decree or to avoid

compliance with it.  The principle is confirmed by precedent."  Equal Employment Opportunity Com'n v. Int'l Longshoremen's Ass'n, 541 F.2d 1062, 1063 -1064 (4th Cir. 1976) (citing Regal Knitwear Co. v. NLRB, 324 U.S. 9 (1945); Thaxton v. Vaughan, 321 F.2d 474 (4th Cir. 1963); Day Companies Inc. v. Patat, 440 F.2d 1343 (5th Cir. 1971); cert. denied, 404 U.S. 830; Alemite Manufacturing Co. v. Staff, 42 F.2d 832 (2nd Cir. 1930).

In Regal Knitwear, the United States Supreme Court determined that under Fed. R. Civ. P. 65(d) an injunction limits the parties and those identified with them in interest, in privity with them, represented by them, or subject to their control, so that a defendant may not carry out prohibited acts through aiders and abettors who were not parties to the original proceeding.  Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 14 (1945).   "[W]hether one brings himself in contempt . . . depends on an appraisal of his relations and behavior and not upon mere construction of terms of the order.  Id. at 15.

One with knowledge of a court order who abets another in violating the order is in contempt.  See Max's Seafood Café v. Quinteros, 176 F.3d 669, 674 (3d Cir. 1999) (citations omitted).  "The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others."  Id.

It is also well established that a person enjoined "cannot circumvent a court's injunction against the activities they had effectuated before the injunction, through one legal entity, by the creation of another entity through which they, or some of them, continue essentially the same activity."  G. & C. Merriam Co. v. Webster Dictionary Co., Inc., 639 F.2d 29, 40 (1st Cir. 1980) (citations omitted).

By Singer's own testimony, it is clear that, not only was he aware of the injunction, he understood the effect and terms of the injunction.  As he stated in his testimony, he knew that the injunction stood in the way of DCPM's ability to legally package The Coasters and The Platters with The Drifters to allow the three groups to perform together at the Las Vegas Sahara as they profitably did prior to the injunction.  To circumvent the injunction, Singer and Mehlich formed a company for the purpose of obtaining the rights to use the name The Elsbeary Hobb Drifters.

Thus, Singer and Mehlich intended to circumvent, and did circumvent, the Court's injunction by creating a new legal entity, Singer Management Consultants, Inc.  Through Singer Management, Mehlich continued to use the name The Drifters, even though he was enjoined directly from doing so as an employee of Marshak and RCI.

**The Injunction Does Not Extend to Jordan "Jody" Marshak**

Jody stated in his declaration that he has not worked for the last ten years as a result of serious health problems and disability.  [Jody Dec. 2].  His declaration was supported by Paula who testified that her husband, Jody, has not worked since the early 1990s.  [Transcript 129 at lines 20-21].  Treadwell has provided no credible support of allegation that Jody's activities either violated the injunction or aided and abetted Marshak and the Motion Respondents in violating the injunction.  Thus, Treadwell's motion to hold Jody in contempt will be dismissed.

**The Injunction Was Violated**

Judge Politan's order specifically and permanently enjoined "Marshak and his employees, assigns, licensees [and] agents . . . from using, directly or indirectly, . . . the name "The Drifters" with regard to the occurrence, sale, promotion or advertising of live or recorded musical

performances."

"A person who is not a party to a proceeding may be held in contempt if he or she has actual knowledge of a court's order and either abets the defendant or is legally identified with him." See, *e.g.*, Quinter v. Volkswagon of America, 676 F.2d 969, 973 (3d Cir. 1982); Roe v. Operation Rescue, 54 F.3d 133, 140 (3d Cir. 1995); Ysah Raj Films (USA) Inc. v. Rannade Corp., 2007 WL 1456193, *10 (May 17, 2007).

Marshak, the Motion Respondents, and Davis have violated the letter, as well as the spirit and intent, of Judge Politan's injunction by engaging in an elaborate shell game through their creation of various business identities in an attempt to deceive Treadwell and the Court. All of them were aware of the injunction, but all of them benefitted financially from their violation of the injunction  because The Coasters, The Platters, and the Drifters, when packaged together, make more money for them. Prior to the injunction The Drifters, The Coasters, and The Platters performed at the Sahara in Las Vegas through the efforts of Marshak and the servants, employees, and agents of Marshak's company, RCI -- Andrea, Paula, Revels, Mehlich, and Davis. After the injunction, The *Elsbeary Hobbs* Drifters resumed performing with The Coasters and The Platters at the Las Vegas Sahara, through the active efforts of Marshak, Andrea, Paula, Revels, Mehlich, and Davis.  Each of them has continued to sell, promote and advertise The Drifters through their own company, DCPM, and through the company formed exclusively for this purpose by Barry Singer and Mehlich, Singer Management.  Their efforts continued after the Court of Appeals affirmed the District Court's order, in spite of their declarations to the contrary.

**Andrea has violated the injunction:**  Andrea, as an employee of Marshak's company RCI, was

directly enjoined from the use of the name The Drifters.  She stated that she was aware of the injunction and its prohibitions.

Andrea stated that she formed DCPM, Inc. to carry on the business of Marshak's company, RCI, and that Marshak assigned his personal rights to The Drifters to DCPM Inc. Through Marshak's rights,  DCPM continued to market The Drifters until the injunction was affirmed by the Court of Appeals in February 2001.  After that, she stated that DCPM stopped marketing The Drifters.  Speaking in her declaration, not only for herself but also on behalf of Cal-Cap, DCPM Operations, and DCPM, Inc., she said that DCPM has not "managed, licensed or booked a 'Drifters' group since the Injunction became effective in 2001."  [Andrea Dec. 3]. Although she acknowledged Mehlich's ownership in both DCPM and Singer Management, she opined that there was no conflict in DCPM working closely with Singer Management to package DCPM's acts with Singer's The Drifters.    [Transcript 95].

However, Andrea's statements and  actions make it clear that she has violated the injunction by continuing to sell or promote The Drifters.  In the conversation she had with a private investigator, which was tape recorded and played at the hearing, she referred to offering The Drifters, The Coasters, The Platters, and The Marvelettes.  [Transcript 91-92].  During her testimony, she rationalized her promotion of The Drifters as "just another 50's moment," an unintentional, automatic response because of her years of working with The Drifters.  [Transcript 106-107].  In her declaration, she explains her reference to The Drifters as her "attempts to provide good, helpful customer service" to someone she believed to be a legitimate customer. [Andrea Dec. 4].   These explanations are not credible for one who claims to be "very cautious of the Injunction's proscriptions" [Andrea Dec. 3], particularly in light of the time frame.  Her

statements were recorded more than five years after the injunction was affirmed.

Further, while Andrea or DCPM may not have "managed, licensed or booked a 'Drifters' group" since 2001, the prohibition of the injunction enjoins her from the sale, promotion, and advertising of The Drifters. Thus, she has violated the injunction by pitching The Drifters to potential clients.

**Paula has violated the injunction:** Paula, as an employee of Marshak in RCI, was directly enjoined from the use of the name The Drifters. She stated that she was aware of the injunction and its prohibitions.

Paula testified that she quotes The Elsbeary Hobbs Drifters rate of $4,500 to callers interested in booking them because she knows "the local prices" for them. [Transcript 119-120]. She recalled the conversation she had with the private investigator, David Woods, in which she quoted the $4,500 Drifters' rate to him, stating that "[i]t good business. . . . [I]f he was looking to book an act, he would need to know the price. I was trying help him." [Transcript 119]. She mentioned The Drifters to Woods because she heard Andrea mention them to him. [Transcript 111, 121, 122], but she mis-spoke when she told Woods that she books The Drifters. Instead, in retrospect, she claimed that she should have said that "we" book them all the time meaning that Singer Management books The Elsbeary Hobbs Drifters. [Transcript 122]. In her Declaration, Paula stated that she "may have spoken over-generally and even mistakenly about The Elsbeary Hobbs Drifters" in her conversations with Woods, but that she did so to be helpful. At the hearing, when asked to clarify what this statement in her Declaration meant, Paula claimed that she might have made a mistake because she did not know what she meant when she made the

statement.

Paula's claims that she was only trying to be helpful when promoting the Drifters to callers and that she mis-spoke about booking The Drifters are disingenuous.  Her testimony confirms that after the decision of the Court of Appeals she has continued to engage in the sale, promotion, and advertising of The Drifters in violation of the injunction.

**Mehlich has violated the injunction:** Mehlich testified at the hearing that he was not an owner or an employee of RCI at any time.  [Transcript 131].  His Declaration states, however, that "[i]n 1990, [he] started doing [Marshak's] personal accounting and also the accounting of his singing group promotion company at the time, RCI Management, Inc.," and that he "learned a great deal about the music promotion business through [his] work for RCI."  [Mehlich Dec. 2].  According to the Declaration of Andrea, Mehlich had been RCI's accountant.  [Andrea Dec. 3].

Mehlich confirmed that DCPM, Inc., the company in which he was a co-owner, continued through February 2001 to promote The Drifters pursuant to Marshak's right to use the name, but that promotion stopped when the Court of Appeals affirmed the injunction against Marshak's use of the name.  [Mehlich Dec. 3].  Mehlich testified, however, that Davis talked to him about purchasing the rights to The Elsbeary Hobbs Drifters.  [Transcript 133, 153].  His other DCPM partners rejected the concept in view of the injunction.  [Transcript 133, 134].   Based on Davis's advice, however, Mehlich stated that he was not concerned about violating the injunction by seeking and obtaining the rights to The Elsbeary Hobbs Drifters.  [Transcript 153].

Although his DCPM partners did not want to get involved with The Elsbeary Hobbs

Drifters, Mehlich was still interested.  He went to Singer with the proposal,[3] and, together, they

formed Singer Management Consultants, Inc. exclusively for the purpose of obtaining the rights.

[Transcript 133].  Ultimately, Singer Management obtained the rights to The Elsbeary Hobbs

Drifters and packaged them with DCPM's Platters and Coasters to perform at the Sahara.

Clearly, Mehlich worked as Marshak's accountant for RCI, as verified by Andrea.  His

employment directly enjoined him from the use of the name The Drifters in commerce.  Yet,

Mehlich has violated the injunction by continuing to sell and promote The Elsbeary Hobbs

Drifters though Singer Management.

**Revels has violated the injunction:**  Revels testified that he was employed first by Marshak's

company, RCI Management Inc.  [Transcript 173, 177].  In June, 1999, he became a co-owner of

DCPM, Inc.  [Andrea Dec. 2].  He stated that Davis advised him, and the other DCPM co-owners,

that they could acquire the rights to The Elsbeary Hobbs Drifters from the Hobbs Estate without

violating the injunction.  [Transcript 182].

Based on this information, in 2002, using as a guide an old RCI Drifters' media kit and

photos that he obtained from the DCPM office in Marshak's basement as a template, on his own

initiative and without the approval or consent of the other co-owners of DCPM, Revels stated that

he made up and sent out  media kits for DCPM which promoted The Drifters in what he

characterized as the "On Broadway" Tour.  [Revels Dec. 1-2].  He did this "[a]lthough it was

beyond the scope of [his] normal responsibilities."  [Revels Dec. 2].  According to Revels, he

included in his "On Broadway" media kit a business card which listed  Mehlich's name as the

_____

[3]In his Declaration, however, Mehlich stated that Singer had approached him about
acquiring the rights to The Elsbeary Hobbs Drifters.

contact person.  [Revels Dec. 3, Transcript 194].  Revels stated that it was a mistake for him to

have acted on this media kit project because DCPM decided not to pursue acquisition of The

Elsbeary Hobbs Drifters.  [Revels Dec. 2-3, Transcript 184-85, 197-98].

Revels excuses are disingeneous and unconvincing.  He is the self-described "creative

director" for DCPM whose job is to "fine tune" the performances of the singing groups.

[Transcript 173, 187].  He admits that he is not the "sales and marketing director," the job and title

that he attributes in his declaration to Paula.  [Revels Dec. 3].  Thus, it strains credulity for Revels

to assert that he acted unilaterally, outside of his normal role,  without the knowledge and consent

of his business partners in developing and mailing a media package promoting The Drifters.  It is

particularly incomprehensible in light of the fact that he did this in 2002 when, by October 2001,

Singer Management acquired the rights to The Elsbeary Hobbs Drifters after the DCPM. co-

owners decided not to pursue acquiring the rights.  [See Marshak Exh. MR-44].  It is even more

incomprehensible, when he was enjoined from doing so as a former employee of Marshak's

company, RCI Management, when the injunction was affirmed in February 2001.

**Davis has violated the injunction:** In spite of being enjoined as an attorney and agent of

Marshak's company, RCI Management, Davis has continued to seek ways to assist the Motion

Respondents in avoiding the terms of the injunction.

After representing Odessa Hobbs in a royalty action against Atlantic Records and

Treadwell, Davis, according to Mehlich, approached Mehlich about buying the rights to The

Elsbeary Hobbs Drifters from the Hobbs Estate.  It was Davis who gave the legal advice that there

was no conflict in DCPM, or Mehlich, acquiring the rights to The Elsbeary Hobbs Drifters.  After

Mehlich and Singer formed Singer Management, Davis became the attorney of record for Singer Management.  He continues to represent Marshak before the TTAB in pursuit of Marshak's right to use The Drifters name, most recently in the case of The Willie B. Pinkney Drifters.  Upon dissolution of RCI, he became the attorney for its successors, DCPM, Inc., DCPM Operations, and Cal-Cap.

Davis's actions are the very type that the injunction was intended to prohibit.

Thus, Marshak, Andrea, Paula, Mehlich, Revels, and Davis knew that the injunction was issued.  Marshak and Andrea, Paula, Mehlich, Revels, and Davis, as former employees and agents of Marshak's company, RCI Management, were directly enjoined from using the name The Drifters.  They, however, continued to sell, promote, and advertise a singing group using the name The Drifters and are in violation of the injunction.

**Treadwell Did Not Relinquish Her Rights to the Name The Drifters to Odessa Hobbs**

Marshak and the Motion Respondents continue to assert that Singer Management legitimately bought the rights to use the name The Elsbeary Hobbs Drifters from Odessa Hobbs, widow of Elsbeary Hobbs, one of the early members of the group.  This assertion, however, was considered and rejected by Judge Politan in his July 1999 decision which states in part that:

> [t]his Court also rejects Marshak's assertion that Treadwell should be judicially estopped from claiming rights in the name "The Drifters" based upon her recent settlement of a royalty dispute in Thomas v. The Drifters, Inc., Index No. 25930/92 (N.Y. Sup.Ct., Queens Cty.).  This Court has examined the transcript of that settlement; it reflects nothing more than Treadwell's agreement to make certain royalty payments to former members of The Drifters.  She did not, as Marshak argues, disavow any rights or claims to the name "The Drifters."  Indeed, the transcript contains no factual findings or representations of any kind.

Judge Politan's findings, which were affirmed by the Court of Appeals, will not be disturbed here.

**Treadwell Did Not Lose Her Rights to the Name The Drifters to Pinkney**

Marshak and the other Motion Respondents argue that Treadwell has lost her rights to the name The Drifters based on a 2004 TTAB decision. In that decision, the TTAB refused Treadwell's registration of The Drifters mark based on the opposition of William (Willie) B. Pinkney ["Pinkney"], a former Drifter. The TTAB found that Pinkney

> has established by a preponderance of the evidence both of his standing and his right to prevail under . . . The Act. The record amply demonstrates that [Pinkney] has continuously used the service marks The Original Drifters and Bill Pinkney & The Original Drifters since long prior to applicant's filing date, the earliest date to which applicant is entitled to rely. . . . There is also little doubt that The Original Drifters and Bill Pinkney & The Original Drifters are substantially similar service marks to THE DRIFTERS, and that, if these marks were used on the identical entertainment services in the nature of a singing group, confusion would be likely.

Willie B. Pinkney v. Treadwell's Drifters, Inc., TTAB Opposition No. 91151984 against Application Serial No. 73807122 *7 (Sept. 24, 2004).

Further, Marshak asserts that he is "in direct privity with Pinkney with respect to the right to use "The Drifters' mark," as the result of consent agreements that he signed with Pinkney in 1983 and 1996. [Marshak Dec. 7]. He states that Pinkney's consent allowed him "to use the mark and to enjoy the fruits of that use with respect to the management, promotion and staging of acts and shows involving the singing group, which in turn were derived from Pinkney's prior and preexisting rights in the mark and name." [Id., Marshak Dec. Exh. B, C].

In response to Marshak's argument that Treadwell lost her rights to Pinkney, Treadwell

argues that the TTAB decision was erroneous because it was based upon Pinkney's deceptive and

fraudulent statements that his use of the mark preceded Treadwell's use.  In support of her

argument, Treadwell submits a copy of an April 21, 1955 employment agreement signed by

Pinkney as the employee and Treadwell on behalf of the employer, Drifters, Inc., which provides

in part that

> 1.  The Employer hereby employs the Artist as a singer . . . either individually or
> with a musical quartette [sic] known as *The Drifters* or any other musical group
> directed by the Employer for a period of five (5) years from the date hereof.
> . . .
> 3. . . .  The Artist shall not render any services for the term hereof except pursuant
> hereto.
> . . .
> 4.  The Employer may terminate this agreement at any time . . . .
> . . .
> 5.  In full consideration for the services to be rendered pursuant hereto, the
> Employer shall pay the Artist and he shall accept his salary . . . .
> 6.  The Employer shall have the exclusive right in its own name . . . .
> 7.  That the Artist agrees to perform and render songs of all types . . . at such time
> and place as shall be designated by the Employer . . . .
> . . .
> 11.  The Employer may assign its rights hereunder, in whole or in part, to any
> person, firm or corporation.
> . . .
> 13.  This contract shall be binding upon the parties hereto, their heirs,
> administrators, representatives and assigns.

[See Salvo Dec., February 28, 2007, Exh. B].

Thus, Treadwell argues that the employment contract, which Treadwell recently found,

proves that Pinkney was merely an employee, similar to the status of Hobbs, Green, and Thomas

who also were found to have no rights to use the name pursuant to their employment agreements.

34

Addressing the privity issue raised by Marshak, Treadwell argues that the consent agreements between Pinkney and Marshak are invalid and non-binding because they were based on Marshak's fraudulent representation that he was the owner of the service mark, The Drifters, which was registered by the TTAB as No. 1,081,338 but later found to be invalid by this court.

Based on the court's review of the documents submitted, Marshak cannot prevail. Pinkney's rights are not superior to those of Treadwell.  Even if Pinkney had rights going back to 1953, as he claimed to the TTAB and which Marshak now claims, Pinkney relinquished those rights when he signed the employment agreement on April 21, 1955, giving full rights in the name to his Employer, Treadwell and The Drifters, Inc.

> The history of the group is noted in the July 30, 1999 opinion of Judge Politan:

> The Drifters first appeared in New York in 1953.  Shortly thereafter, in 1954, the group came under the management of George Treadwell . . . .  Mr. Treadwell managed the group through The Drifters, Inc., a New York corporation that he formed in 1954.  He married . . . Faye Treadwell in March of 1955.

> Although Mr. Treadwell owned all of the Drifters, Inc. stock, he managed the company with his two partners . . . .  Together, they exercised complete artistic control over The Drifters: they hired and fired Drifters singers; they paid the singers a weekly salary; they selected the music and arrangements; and they made all musical and business decisions relating to both live performances and recording contracts.

> Since the group's inception, The Drifters has always been comprised of a constantly changing case of singers . . . .  During George Treadwell's stewardship, each Drifters singer was an employee of The Drifters Inc., and each of them signed a written employment contract and received a weekly salary.

> . . .  It was undisputed that Mr. Treadwell exercised exclusive managerial control over the group, without interruption, from 1954 until his death in 1967.

>After Mr. Treadwell's death, his widow Faye succeeded him as The Drifters'
>principal manager and shareholder.

See Marshak v. Treadwell, 58 F. Supp. 2d at 554.

Judge Politan's description precisely describes the terms of Pinkney's employment contract. If Pinkney had any rights in the name prior to signing the employment agreement, he relinquished them in favor of becoming merely a paid employee with no managerial control over The Drifters personnel, music, live performances, or recording contracts, and with no rights to use the name The Drifters, while the contract was in effect. In light of the fact that the stated duration of the contract was five years, the earliest date that Pinkney could begin to assert use rights to the name The Drifters would have been April 21, 1960, well after Treadwell's use date of 1954. Thus, Pinkney's representations to the TTAB were fraudulent and deceptive in that Pinkney knew, or should have known, that he signed an employment contract which gave Treadwell, not Pinkney, the exclusive right in the name. As in the case of Marshak v. Treadwell, "the equitable defense of laches is inapplicable to claims of fraud." Id. at 564.

Marshak urges the court to read the two consent agreements that he signed with Pinkney as Pinkney's grant of rights to Marshak. It is precisely the opposite. Marshak challenged Pinkney's use of the name The Drifter via Marshak's Trademark Registration No. 1,081,338. The 1983 consent agreement specifies that Marshak is the owner of the service mark The Drifters with the unqualified and exclusive right to its use throughout the United States, but Marshak grants Pinkney "the unqualified right during his lifetime to use throughout the entire United States the name or mark 'The Original Drifters' and the name or mark 'Bill Pinkney and The Original Drifters' to identify a musical performing group." [Marshak Dec. Exh. B at ¶¶ 3, 5]. The 1996

36

consent agreement is predicated upon the same trademark registration number and contains the same two provisions; that is, that Marshak owns the mark with unqualified and exclusive use rights, but Marshak grants Pinkney lifetime use of the name or mark of The Original Drifters and the name or mark Bill Pinkney and The Original Drifters.  By virtue of the fact that Mr. Pinkney is now deceased,[4] the grant of lifetime rights to use the name has expired.

However, Judge Politan's finding, and its affirmation by the Court of Appeals, that Marshak's Trademark Registration No. 1,081,338  had been obtained by fraud effectively vitiated the consent agreement between Marshak and Pinkney because a grantor cannot give rights greater than those which he owns.  (See Operating System Support, Inc. v. Wang Laboratories, Inc., 2001 WL 1602106, *4 (D.N.J. Apr. 23, 2001) ("It is axiomatic that a transferee cannot acquire greater property rights than those held by his transferor.")  Thus, when Marshak's rights were nullified, so were Pinkney's.

Marshak has no valid right to the use the name The Drifters either through Pinkney or through trademark registration.

## CONCLUSION

Marshak has not shown that William B. Pinkney's right to use of the name The Drifters is valid and superior to that of Treadwell.  His cross-motion to vacate Judge Politan's injunction will be denied.

With the sole exception of Jody Marshak, Treadwell has shown that Marshak and the

---

[4]The Court notes that, as reported in the July 6, 2007 issue of the New York Times, the death of Mr. Pinkney occurred on July 4, 2007.

Motion Respondents have violated the terms of the injunction issued by Judge Politan and

affirmed by the Court of Appeals, and they will be held in contempt.  Treadwell has not shown

that Motion Respondent Jody Marshak has violated the terms of the injunction and, thus, Jody

Marshak will not be held in contempt.


/s/ Dickinson R. Debevoise
Dickinson R. Debevoise, U.S.S.D.J.


Dated: September 7, 2007